Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 CR 529 - 1,2,3 | DATE | 7/5/2001 |
| CASE TITLE | USA vs. Hendershot, Battista, Lanas | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' objections to the preliminary sentencing calculations are largely overruled. The court directs the probation officers to make adjustments in the amount of loss attributable to the Defendants. This results in a reduction of one level in Lanas' guideline calculations, but no adjustments in the calculations with respect to Defendants Battista or Hendershot. Sentencing is set for Friday, August 17, 2001 at 9:30 a.m.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 06 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | 7/5/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | COURT DOCKETING 01 JUL -5 PM 5: 26 | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: 99 CR 529 |
| | ) | |
| RICHARD A. HENDERSHOT, | ) | Judge Rebecca R. Pallmeyer |
| JAMES A. BATTISTA and | ) | |
| CLIFFORD J. LANAS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

More than one year ago, Defendants Richard A. Hendershot, James A. Battista, and Clifford J. Lanas were convicted by a jury on mail fraud charges growing out of an illegal kickback scheme involving Hendershot's former employer. Hendershot was the central figure in this scheme: He collected kickbacks from private investigators whom he hired to perform surveillance work for his employer, Alexsis, Inc., a third-party administrator for workers' compensation claims. Defendant Lanas operated one of the private investigation services which paid kickbacks to Hendershot, and Defendant Battista served as "bagman," passing the kickback money from P.I. firms to Hendershot while retaining a portion for himself.

On July 7, 2000, the court denied all Defendants' motions for acquittal or a new trial. Sentencing was delayed for several months, initially at the request of defense counsel and more recently due to the court's trial schedule. Now before the court are the Presentence Investigation Reports ("PSRs") concerning each of the Defendants.

Each Defendant has submitted objections to the PSR and the government has filed a consolidated response. The court addresses the Defendants' objections below.

## I.    Guideline §2B4.1

The PSRs recommend that the court apply U.S.S.G. § 2B4.1, the guideline for cases of "Commercial Bribery and Kickbacks." It commands a base offense level of 8, see § 2B4.1(a), and commands a specific offense characteristics increase of "the corresponding number of levels from the table in § 2F1.1" if "the greater of the value of the bribe or the improper benefit to be conferred exceeded $2,000." § 2B4.1(b)(1).

Each of the three Defendants here objects to the use of § 2B4.1, and urges the court instead to apply U.S.S.G. § 2F1.1, the guideline applicable to offenses involving fraud and deceit. The base offense level for fraud is 6, see § 2F1.1(a), and the specific offense characteristics increase is based on the amount of "loss" rather than the amount of the bribes. See § 2F1.1(b)(1). The court notes, initially, its uncertainty about whether selection of § 2F1.1 would make a genuine difference in this case, where each Defendant is likely to face a two-level increase for the specific offense characteristic of "more than minimal planning." *See* § 2F1.1(b)(2).

In any event, the court concurs with the Probation Office's choice of § 2B4.1 as the appropriate guideline here. U.S.S.G. § 1B1.2 requires the court to "[d]etermine the offense guideline in Chapter Two (Offense Conduct) most applicable to the offense of conviction." There is little doubt that section 2B4.1, and not section 2F1.1, is most applicable here. Section 2B4.1 applies by its title to "commercial bribery and kickbacks," precisely the conduct involved in this case. The government prosecuted

this case as a bribery case, not a fraud case. For example, the Indictment uses the term "kickback" dozens of times, but characterizes Defendants' conduct as "false and fraudulent" far less frequently. *See United States v. Anderson*, 85 F. Supp.2d 1084, 1104 (D. Kan. 1999) (choosing § 2B4.1 over §2F1.1 in Medicare kickback prosecution where indictment used the word "bribe" thirty-four times, but "fraud" or "defraud" only twice). Although this case, like *Anderson*, unquestionably involves elements of fraud, the central focus of the charges against Defendants Hendershot and Battista are the kickbacks demanded by Defendant Hendershot and paid through Defendant Battista by Defendant Lanas and others.

Other case law supports the probation officer's recommendation here. In a case similar to this one, *United States v. Montani*, 204 F.3d 761 (7th Cir. 2000), defendant Montani was assigned by his employer to sell furniture inventory and took a large kickback from the purchaser. A jury convicted Montani of depriving his employer of the right to honest services, and the Seventh Circuit affirmed sentencing under § 2B4.1. Similarly, in *United States v. Jain*, 93 F.3d 436, 442-43 (8th Cir. 1996), *cert. denied*, 520 U.S. 1273 (1997), the Eighth Circuit affirmed the use of section 2B4.1 in determining the base offense level in the sentence of a psychologist who received payment from a hospital in exchange for referring patients to that hospital.

In *United States v. Hauptman*, 111 F.3d 48, 50-51 (7th Cir. 1997), the Seventh Circuit affirmed a determination that the fraud guideline, § 2F1.1, applied, rather than the commercial bribery guideline, but the court noted that in that case defendant

3

bribed a purchasing agent to purchase a vast supply of unnecessary cleaning supplies from defendant's company. Upbraiding the government for having agreed to application of the bribery guideline, the court noted, "the bribing of [the purchasing agent], rather than being the essence of the offense, was merely the means for defrauding [the purchasing agent]'s employer." 111 F.3d at 50. The court explicitly distinguished these circumstances from "the usual case of commercial bribery . . . [in which] either the person giving the bribe is being shaken down by a customer's purchasing agent, or, if the briber is the one taking the initiative, his objective is merely to get 'his share' of the customer's business." *Id.* (citations omitted). In this court's view, the conduct of Defendants Hendershot and Battista present "the usual case of commercial bribery."

Defendant Lanas argues that the evidence concerning his conduct requires a different conclusion. He notes the evidence that when he received payment from Alexsis for investigative work, he wrote checks to Richard Lantini and to cash for himself but had no direct contact with Defendant Hendershot. As the government points out, however, Lantini and Lanas agreed that Three Star and Park Investigation, the private investigation firms owned or controlled by Lanas or Lantini, would make cash kickback payments of $700 per job *in return for* their share of the investigation business. (Government's Consolidated Response, at 21.) True enough, Lanas inflated some of the invoices by billing Alexsis for two investigators on jobs where only one was used; but Lantini testified that this double-billing was done at Battista's direction, and the double bills had the effect of increasing Battista's own unlawful profits. Lanas'

4

conduct may fairly be characterized as fraudulent, as well, but the court agrees that commercial bribery most closely describes his wrongdoing.

Defendants' objections to the application of the commercial bribery guideline § 2B4.1 are, therefore, overruled.

## II. Loss Calculations

Each Defendant has objected to the probation officer's calculation of the amount of loss for which that Defendant is responsible. A defendant has "a due process right to be sentenced on the basis of accurate information," *United States v. Westbrook*, 986 F.2d 180, 182 (7th Cir. 1993), but the amount of loss "need not be determined with precision." U.S.S. G. § 2B1.1, app. note 3. "So long as the information the sentencing judge considers has a sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence." *United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993). In this case, the court heard testimony concerning the amounts involved and has before it the business records of Alexsis, of some of the P.I. firms, and of banks. As explained below, the court finds minor errors in the probation officer's calculation of the amount of loss for which each of the defendants is responsible, but concludes that only the error with respect to Lanas changes the calculation of his base offense level.

### A. Hendershot

The probation officer calculates that Defendant Hendershot received $233,720 in illegal kickbacks from private investigation firms. Hendershot objects to this calculation, adopting Defendant Lanas' and Battista's arguments and raising

additional objections to the calculations of kickbacks associated with Thomas Herley. As Exhibit A to its presentence submission, the government has furnished a list of Alexsis checks deposited to Thomas Herley's Citibank account, identifying the amount of the check and the amount of cash Herley recovered. The government and the probation officer suggest these kickback amounts reflect the pattern of $250 per case, and, later, $350 per case cash kickbacks.

As part of his objections to the loss calculations, Defendant Hendershot has submitted excerpts from this list, reflecting cash withdrawals in amounts other than $250 or $350. (Position of the Defendant Richard Hendershot with Respect to Sentencing Factors, at 12-13.) Hendershot urges he is entitled to a hearing to determine the precise amount of cash kickbacks paid him by Herley. In considering this argument, the court first notes that the government did not argue that, for every Alexsis check, Herley recovered cash back in an amount precisely equal to the expected kickback. Herley testified that when he deposited a check, he would obtain cash back to cover the kickback amount, plus some spending money for himself. On those occasions where there was not enough money in the account, Herley waited a few days for the Alexsis check to clear and then wrote a check to cash.[1]

The court has compared Hendershot's excerpted list carefully against the government's Exhibit A. With respect to many of the checks listed in Hendershot's

---

[1]     Although it is not strictly relevant to this inquiry, the court notes that Herley's testimony concerning these cash kickback payments was further corroborated by the fact that between August 1991 and May 1993, Hendershot made cash tuition payments to DePaul University in an amount in excess of $16,000.00.

excerpt, the court notes that the deposits were made within days of another deposit, and that adding the cash back from that other deposit with the cash back for the check Hendershot has listed yields an amount sufficient to fund the kickback payment. For example, Hendershot's excerpt lists the January 31, 1992 check deposit for two jobs, on which Herley recovered only $600 cash back. Just a week earlier, however, Hendershot took cash back of $1500 from an $1832 Alexsis check. The same observation can be made concerning the August 8, 1991 check and $100 cash back (grouped with $600 and $100 cash back for checks deposited on August 9 and August 10, total $800); the October 7, 1991 check and $200 cash withdrawal (coupled with $600 cash back for a check deposited on October 12, 1991, total $800); the July 10, 1992 check and $200 withdrawal (coupled with $900 cash back for a check deposited on July 14, 1992, total $1100); the April 7, 1993 check and $500 cash back (coupled with $1500 cash back for a check deposited on April 12, 1993, total $2000); the September 20, 1993 check and $100 withdrawal (coupled with $1300 cash back for a check deposited on September 21, 1993, total $1400). Herley recovered no cash back at all from checks deposited on November 29 and December 14, 1993, but in each of these instances he deposited another check three days later and took a substantial cash withdrawal on each of these (December 2, 1993, $1500, and December 17, 1993, $1000).

For a handful of other checks, it appears that Herley took cash back in amounts less than $350, but supplemented the withdrawal by writing a check to cash within a few days. *See* Government Exhibit Schedule B to Government's Consolidated

Presentencing Submission. Thus, he deposited an Alexsis check on March 11, 1992 and took only $200 cash back, but he had written a check for $500 only two days earlier. On December 15, 1992, Herley deposited a check for three jobs but took only $500 cash back; but seven days later he wrote a check to cash in the amount of $2700. The $2700 check also amply explains Herley's recovery of a mere $200 on December 30, 1992. The March 19, 1993 and March 29, 1993 cash withdrawals of only $200 each were supplemented by the $1000 checks to cash that Herley wrote on March 8 and March 22. On April 7, 1993, Herley deposited a check and recovered cash back of only $500 for the two jobs reflected in that deposit, but five days earlier he had written a check to cash in the amount of $1100. The August 10, 1993 cash withdrawal of only $500 for four jobs appears to have been supplemented by a $1200 check to cash that Herley wrote on August 13. Finally, the November 15, 1993 check and $300 cash withdrawal took place just four days before a $600 check to cash that Herley wrote on November 19, 1993.

Only two transactions are not obviously susceptible to such simple explanation. Herley deposited Alexsis checks on April 13, 1992 and February 26, 1993, and took cash withdrawals of only $100 on those occasions. Neither of these cash withdrawals was on its face adequate to pay the Hendershot kickback, nor is there evidence that Herley took cash back from another check or wrote a contemporaneous check to cash. With respect to these two checks, the court will sustain Hendershot's objection and direct the probation officer to exclude these checks from the calculation of loss.

This adjustment will not, however, alter the probation officer's determination

that an increase in 8 levels is appropriate; the amount of loss resulting from Hendershot's conduct exceeds $200,000 but is less than $350,000. Pursuant to § 2F1.1(b)(1)(I), this amount of loss results in an 8-level increased offense level.

### B. Battista

Defendant Battista also objects to the amount of cash kickbacks attributable to him. The evidence at trial concerning Battista's involvement related to four private investigation firms: PPS, Megco, Three Star, and Park. In its sentencing memorandum, the government argued that Battista recovered bribes in the amount of $680 per job for jobs performed by PPS and Megco, and $700 per job for work performed by Three Star and Park. The government's initial sentencing memorandum holds Battista accountable for kickbacks in connection with 96 private investigation jobs performed by PPS, 88 jobs by Megco, 9 jobs by Three Star, and 49 jobs by Park. Battista argues the evidence does not support these job numbers with respect to PPS, Megco, and Park.

### (i) PPS

Apparently relying on Government Exhibit Schedule C, Battista argues the government offered evidence of only 38 jobs performed by PPS for Alexsis. (Battista's Objections to the Preliminary Pre-Sentence Investigation Report, at 12-13.) As the court reads Schedule C, however, it reflects deposits of Alexsis checks to PPS, and contemporaneous cash withdrawals. Schedule C does not purport to document every job performed by PPS for Alexsis. It does, however, corroborate the testimony of Michael Levine, PPS's principal, that he fell into a pattern of paying kickbacks in a flat

amount of $680 per job. As the government notes, several of the cash withdrawals recorded in Schedule C are in the amount of $680 or a multiple of that amount.

Michael Levine, who operated PPS, testified that he met with Hendershot and Battista at a bar in Forest Park, Illinois, and agreed to an arrangement in which Levine would kick back 40% (20% for Hendershot and another 20% for Battista) of the amounts paid to PPS by Alexsis. Levine testified that he ordinarily obtained information concerning surveillance assignments from Battista, delivered the completed surveillance reports to Battista, and made kickback payments on each job. Alexsis' own records of its payments to PPS, offered in evidence as Government Exhibits Alexsis 3A, 3B, 3C, 3D, and 3E, demonstrate that Alexsis paid PPS for 10 surveillance jobs in the July through December 1991 time frame, after the Forest Park meeting. Alexsis records show payments to PPS for another 44 surveillance jobs in 1992, 15 in 1993, and 22 in 1994, a total of 91 jobs. The court concludes that the amount of loss to Alexsis resulting from the PPS payments is $61,880 (91 jobs x $680 per job).

### (ii) Megco

In the middle of 1992, Levine involved a second PI firm, Megco, Inc., in kickback payments to Battista. Megco was controlled by Ernest Marinelli, who, like Levine, was employed as a member of the Cook County Sheriff's police department. Levine told Marinelli that payments on Alexsis jobs were to be divided, after payment of expenses, as follows: 50% to Battista, who would share this amount with Hendershot; and 50% to be shared by Levine and Marinelli. Marinelli provided Battista's $680 payment

10

through Levine: He wrote a check to Levine that included both Levine's share of the profit and Battista's $680 payment, payable either to Levine or to Myco, a company controlled by Levine. Levine wrote checks on the Myco account to straw payees. Bank records set forth on the government's Schedule D again reflect several of Levine's cash withdrawals or checks in the amount of $680 or a multiple of that figure. Those records also corroborate Levine's testimony that, beginning in early 1993, Levine accomplished making kickback payments to Battista by writing checks to third parties who served as straw payees. John Presto, who cashed these checks at a currency exchange, returned the cash to Levine.

Government Exhibits Alexsis 4A, 4B, and 4C show that Alexsis paid Megco for 14 surveillance jobs in 1992, for 74 jobs in 1993, and for one job in 1994. For each such job, the government introduced a copy of a cost breakdown sheet handwritten by Levine. Marinelli or his wife, who served as bookkeeper for Megco, used these sheets to issue checks for each individual involved in each job. Each of these cover sheets includes the notation "JB - $680," a reference to the $680 paid to James Battista for each job. The court concludes that the amount of loss to Alexsis resulting from the Megco payments is $60,520 (89 jobs x $680 per job).

### (iii)   Three Star/Park Investigations

Yet another group of Alexsis jobs and cash kickbacks involved Richard Lantini and Defendant Clifford Lanas, who operated Three Star Detective & Security Agency, Inc. ("Three Star") and Park Investigations, Inc. ("Park"). Lantini testified that Battista told him at a meeting early in 1993 that he could arrange to have Hendershot

11

direct Alexsis surveillance assignments to Lantini and Lanas in exchange for cash kickbacks in amounts of $700 to $900 per job. Lantini brought the proposal to Lanas, who agreed to participate after preparing two typewritten worksheets to determine the profitability of such an arrangement (introduced at trial as Government Exhibits Lantini 1H and 1I). In April, May, June, and August 1993, Alexsis paid Three Star for nine surveillance jobs. (Government Exhibit Schedule F.) Nine invoices for these jobs were offered in evidence (Government Exhibit Lantini 3-11), and Lantini testified that he paid a kickback of $700 to Battista for each of these jobs. The court concludes that the amount of loss to Alexsis resulting from the Three Star payments is $6300 (9 jobs x $700 per job).

In March 1993, Lanas and Lantini incorporated Park Investigations. Park began operating later that year and Alexsis paid Park for 30 surveillance jobs in 1993 and 18 jobs in 1994. (Government Exhibit Alexsis 6.) Of 29 checks written to Lantini or to cash from the Park Investigation account between July 1993 and August 1994, 27 are in the amount of $700 or an exact multiple of that amount. (Government Exhibit Schedule G.) The memo lines for several of these checks refer to one or more of the surveillance jobs, strong circumstantial evidence of the kickback scheme. Until May 1994, the $700 checks were written to Lantini, who testified that he cashed the checks at Cragin Federal Bank and delivered the cash to Battista. On May 3, 1994, Lantini was taken into custody on federal marijuana charges; after that date, Lanas wrote checks from the Park Investigation account to cash for purposes of the kickback payments. (Schedule G.) The court concludes that the amount of loss to Alexsis

resulting from the Park payments is $33,600 (48 jobs x $700 per job).

The total loss to Alexsis for the PPS, Megco, Three Star, and Park schemes is $162,300. The court will direct the probation officer to correct the report to reflect this calculation. Because that amount exceeds $120,000 but is less than $200,000, the probation officer correctly concluded that the base offense level for Battista should be increased 7 levels. *See* U.S.S. G. § 2F1.1(b)(1)(I).

### C.    Lanas

Defendant Lanas has not specifically challenged the probation officer's calculation of his offense level. The court notes, however, that the Pre-Sentence Investigation Report asserts that Lanas paid kickbacks for 19 surveillance jobs in 1994. As noted above, the court believes (and the government's response acknowledges) that Alexsis paid Park for only 18 jobs in 1994. This alteration reduces the amount of loss in which Lanas was involved to $39,900 ($9300 for Three Star and $33,600 for Park). Pursuant to § 2F1.1(b)(1)(E), where the loss is greater than $20,000, but less than $40,000, the base offense level should be increased by four levels, not by five as determined by the probation officer.

## III.   Role in the Offense

Each Defendant has objected to the probation officer's conclusion regarding his role in the offense. Again, the court addresses those objections in turn.

### A.    Hendershot

The probation officer recommends that Hendershot's offense level be increased by four pursuant to U.S.S. G. § 3B1.1(a) because he was an organizer or leader of

criminal activity that involved five or more participants, and by two more levels pursuant to §3B1.3 because he abused a position of private trust. Hendershot objects to each of these adjustments, but the court concludes both are appropriate.

### (i)    Leader or Organizer § 3B1.1(a)

Section 3B1.1(a) of the Guidelines permits the district court to increase a defendant's offense level by four levels based on a finding that the defendant was a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a). When applying this provision, the court takes the following factors into consideration: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment. (n.4). The court weighs these factors "in light of the Guidelines' intent to punish with greater severity leaders and organizers of criminal activity," *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir. 1999), and may apply the upward adjustment even though not all seven factors are present, *United States v. Richards*, 198 F.3d 1029, 1033 (7th Cir. 2000); *United States v. Akinrinade*, 61 F.3d 1279, 1289 (7th Cir. 1995).

Hendershot's role in the offense conduct here supports application of the enhancement. It was Hendershot whose employment with Alexsis made the kickback scheme possible. He initiated the scheme and carried it out by assigning Alexsis work

to private investigation firms willing to pay his price. He set the amount of the kickbacks, and he had authority to approve the PI firms' invoices. Henderson recruited accomplices: He negotiated directly with Levine and Herley. When Battista became involved, Henderson permitted Battista to set up deals with Lantini and Lanas, and, once they were recruited into the scheme, directed Alexsis surveillance jobs to Three Star and Park. Henderson claimed the right to the fruits of the crime: he required PI firms to pay him personally in return for the privilege of obtaining assignments from Alexsis. Battista also later claimed a cut in an amount equal to Henderson's, but the other participants benefitted less directly, recovering the profits on surveillance jobs their firms performed (or, in some cases, merely purported to perform). Hendershot was the central participant in the kickback scheme, which spanned several years, several PI firms, and hundreds of individual surveillance jobs. Levine, Herley, Battista, Lantini, and Lanas all participated in the criminal activity, controlled and directed by Hendershot.

This is at least as strong a case for application of § 3B1.1(a) as was *United States v. Emerson*, 128 F.3d 557 (7th Cir. 1997). In that case, the Seventh Circuit affirmed application of the four-level enhancement where the defendant, a postal service employee, engaged in a scheme of arranging postal office construction contracts in exchange for kickbacks. *Id.* at 559. Emerson, like Hendershot, recruited contractors purportedly to perform work for his employer in return for kickbacks of cash and property to himself. *Id.* at 560. Like Emerson, Hendershot directed contractors concerning the amounts of the kickbacks and the method of payment; for example,

15

Herley testified that on several occasions he did no work at all on surveillance jobs for which he billed Alexsis. Hendershot knew this, and required an enhanced kickback amount for himself in return for passing those bills along to his employer. Like Emerson, Hendershot has earned the four-level increase.

### (ii)    Abuse of Trust § 3B1.3

Nor is the court moved by Hendershot's objection to the probation officer's recommendation of a two-level increase for abuse of a position of trust. *See* U.S.S.G. § 3B1.3. In addressing this enhancement, the court considers: "1) whether the defendant occupied a position of trust; and 2) whether his abuse of the position of trust significantly facilitated the crime." *United States v. Brown*, 47 F.3d 198, 205 (7th Cir. 1995). Hendershot did occupy a position of trust: he exercised discretion over which PI firms Alexsis would use and how much they would be paid. Similarly, in *Emerson*, the court concluded that *Emerson* "occupied a position of trust because he had authority over 'valuable things,'" 128 F.3d at 562, quoting *United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993) – lucrative surveillance assignments. Hendershot's position within Alexsis, like that of the postal service worker in *Emerson*, "obviously facilitated the scheme because a crucial element of the scheme involved [his] awarding of contracts . . . to those contractors that would provide him with kickbacks." 128 F.3d at 563. Nor is there any merit to Hendershot's suggestion (Position of the Defendant Richard Hendershot, at 17-18) that application of the "abuse of trust" enhancement in a case of commercial bribery constitutes double counting. *United States v. Josleyn*, 99

16

F.3d 1182, 1199 (1st Cir. 1996); *see also United States v. Dion*, 32 F.3d 1147, 1149-50 (7th Cir. 1994).

Hendershot analogizes his situation to that of the embezzling bank teller, but the effort is unsuccessful. There is simply no evidence that Hendershot's work was under "constant supervision," (Position of Defendant Richard Hendershot, at 17) or that his offense could readily have been detected. To the contrary, Hendershot's scheme was largely undetectable, as he could plausibly represent that the prices charged by the PI firms with whom he did business were no larger than necessary to generate a profit for the vendors. Not surprisingly, Alexsis' records contained no indication of amounts being held back or set aside for Hendershot himself, and no ready basis for exposure of his wrongdoing. The probation officer correctly added two points for Hendershot's abuse of trust.

### (iii) Criminal History

Hendershot's final objection to the probation officer's calculations may be addressed with dispatch. The probation officer's report adds a point to Hendershot's criminal history for a 1993 DUI conviction, and then two more points because this offense was committed in part during the time that Hendershot was on court supervision as a result of that conviction. Hendershot correctly notes that expunged convictions are not counted under the Guidelines, § 4A1.2(I), and that his DUI conviction is expungable under Illinois law. 20 ILCS 2630/5. What Hendershot slides past is the fact that he never took steps to have his DUI conviction expunged. *United States v. Johnson*, 941 F.2d 1102, 1110-1111 (10th Cir. 1991), which he cites, is

17

distinguishable because the Oklahoma criminal statute involved there provides that a conviction will automatically be expunged under certain conditions, which the defendant in that case had met. Hendershot's objection to this enhancement to the sentence calculation is overruled.

## B.    Battista

The probation officer has adjusted Battista's offense level by three points pursuant to U.S.S.G. § 3B1.1(b) on the basis that Battista was a manager or supervisor of the criminal activity, and that the activity involved five participants. Battista objects to this adjustment, but the court concludes the evidence warrants it.

The Seventh Circuit has explained that § 3B1.1 is concerned with "the imposition of punishment commensurate with the defendant's 'relative responsibility within the criminal organization.' *United States v. Akinrinade*, 61 F.3d 1279, 1289 (7th Cir. 1995) (citing *United States v. Johnson-Dix*, 54 F.3d 1295, 1309 (7th Cir. 1995), quoting *United States v. Fones*, 51 F.3d 663, 665 (7th Cir. 1995)). Factors identified as relevant to the issue are the same ones discussed above with respect to the issue of Hendershot's role as organizer or leader -- that is, the nature of defendant's participation, recruitment of accomplices, claimed right to larger share of proceeds, planning, control, authority over other participants, and the like.    U.S.S.G. § 3B1.1, comment. (n.4).

This court agrees with the government (Government's Consolidated Response, at 16-18) that the "manager or supervisor" characterization fits here for several reasons: Battista was involved in the scheme from 1991 through 1994. He furnished

PI firms with information concerning the surveillance jobs, personally collected hundreds of cash kickbacks, maintained records, and delivered funds to Hendershot. Unwilling for his profits to be reflected in a tax record, Battista provided names of persons who would serve as "straw payees" on checks destined to benefit Battista and Hendershot. Battista involved Lantini in the kickback scheme and solicited the participation of lawyers who declined the invitation but gave testimony in this case. Battista retained the same share of the kickbacks as did Hendershot. Although not as centrally involved as Hendershot, who worked for Alexsis and could therefore direct Alexsis' business to willing contractors, Battista unquestionably "orchestrated" or "coordinated" the activities of others. *See United States v. Dillard,* 43 F.3d 299, 307 (7th Cir. 1994).

The court concludes the probation officer correctly determined that Battista was a "manager or leader." That conclusion requires, as well, that the court overrule Battista's objection to the probation officer's failure to reduce his offense level based on his alleged mitigating role in the offense.

## C.    Lanas

Clifford Lanas also believes he is entitled to a downward adjustment due to his mitigating role. It was Lanas who signed the Three Star and Park checks that generated cash for the kickbacks. Lantini testified that he and Lanas followed Battista's instructions that they use only one investigator on some jobs, but bill for two. Lanas notes that he never met Hendershot, but Lanas himself typed up the surveillance reports and invoices, complete with the amounts necessary to fund

kickbacks to Battista and Hendershot. Although Lanas was neither an organizer nor a manager of the criminal activity at issue here, neither was he a minor participant.

The court agrees with Lanas that his culpability is far less than that of the other Defendants convicted here. Nevertheless, the Guidelines calculations here address only the kickback episodes in which Lanas himself was involved. He was not a minor or minimal participant in his own conduct, *see United States v. Brown*, 136 F.3d 1176, 1186 (7th Cir. 1998) (quoting *United States v. Lampkins*, 47 F.3d 175, 181 (7th Cir. 1995)). Lanas' request for a downward adjustment on this basis is therefore denied.

## CONCLUSION

For the reasons set forth above, the court concludes that no further evidentiary hearing is necessary on these issues. Defendants' objections to the preliminary sentencing calculations are largely overruled. The court directs the probation officers to make adjustments in the amount of loss attributable to the Defendants as described above. This results in a reduction of one level in Lanas' guideline calculations, but no adjustments in the calculations with respect to Defendants Battista or Hendershot. Sentencing is set for Friday, August 17, 2001 at 9:30 a.m.

ENTER:

Dated:     July 5, 2001

REBECCA R. PALLMEYER
United States District Judge